TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
ROBERT AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  (310) 474-9111
Facsimile:   (310) 474-8585

BEN BARNOW*
b.barnow@barnowlaw.com
ANTHONY L. PARKHILL*
aparkhill@barnowlaw.com
RILEY W. PRINCE*
rprince@barnowlaw.com
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Telephone:  (312) 621-2000

*pro hac vice* to be filed

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG ARCILLA, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br>   v.<br><br>WILDERNESS SPORTS WAREHOUSE, LLC d/b/a TACKLE WAREHOUSE, LLC; SPORTS WAREHOUSE d/b/a TENNIS WAREHOUSE; RUNNING WAREHOUSE, LLC; and SKATE WAREHOUSE, LLC,<br><br>            Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Craig Arcilla ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendants Wilderness Sports Warehouse, LLC d/b/a Tackle Warehouse, LLC; Sports Warehouse d/b/a Tennis Warehouse; Running Warehouse, LLC; and Skate Warehouse, LLC (collectively, "Defendants") and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## **INTRODUCTION**

1.      Plaintiff brings this class action against Defendants for their failure to secure and safeguard his and approximately 1,813,223 other individuals' private information, including names, mailing addresses, payment card numbers, expiration dates, and card security codes ("PII").

2.      Defendants are a group of online retailers specializing in products relating to certain industries, namely fishing, tennis, running, and skateboarding.

3.      On or about October 1, 2021, Defendants discovered that unauthorized individuals gained access to Defendants' network systems and had access to the PII of Plaintiff and Class members (the "Data Breach").

4.      Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their customers' PII from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII was exposed as a result of the Data Breach, which Defendants learned of on or about October 15, 2021 and first publicly acknowledged on or about December 16, 2021.

CLASS ACTION COMPLAINT

6.     Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, unjust enrichment, violation of the California Consumer Privacy Act of 2018, and violation of the California Unfair Competition Law, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

7.     Plaintiff Craig Arcilla is a California resident, and resides in Beaumont, California. He provided his PII to Defendants in connection with purchasing goods online from Running Warehouse. Plaintiff's latest purchase from Running Warehouse was in September 2020. In or about late October 2021, Plaintiff was attempting to pay for gas for his car, when his Mastercard from Schools First Federal Credit Union was declined. Plaintiff called his credit union about the declined payment, and he was informed that his credit card was locked due to fraud. Plaintiff subsequently learned that he suffered between 5-10 fraudulent charges on his credit card. Plaintiff was issued a new card by his credit union, but he was without the use of his account for approximately 1.5 weeks. On or about December 23, 2021, Plaintiff received an e-mail from Running Warehouse notifying him that his PII may have been exposed in the Data Breach. In the email, Defendants informed: "The incident may have involved payment card information, including your name, address, payment card number [last four digits of Plaintiff's impacted card], expiration date, and payment card security code." Had Plaintiff Arcilla known that Defendants do not adequately protect PII, he would not have used Defendants' services, made purchases with Defendants, and agreed to provide Defendants with his PII.

8.     Defendant Wilderness Sports Warehouse, LLC d/b/a Tackle Warehouse, LLC, is a limited liability company formed in California, and its headquarters are located at 181 Suburban Road, San Luis Obispo, CA 93401. Wilderness Sports Warehouse, LLC owns the trademark to Tackle Warehouse.

9.      Defendant Sports Warehouse d/b/a Tennis Warehouse is a corporation incorporated in California and its corporate headquarters are located at 181 Suburban Road, San Luis Obispo, CA 93401. Sports Warehouse owns the trademark to Tennis Warehouse.

10.     Defendant Running Warehouse, LLC, is a limited liability company formed in California and its headquarters are located at 181 Suburban Road, San Luis Obispo, CA 93401.

11.     Defendant Skate Warehouse, LLC, is a limited liability company formed in California and its headquarters are located at 181 Suburban Road, San Luis Obispo, CA 93401.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Defendants because Defendants have their principal place of business at 181 Suburban Road, San Luis Obispo, CA 93401.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants' principal place of business is located in San Luis Obispo, California.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

15.     Tackle Warehouse is an online retail store that sells fishing merchandise, including fishing rods, reels, and bait.

16.     Tennis Warehouse is an online retail store featuring tennis equipment, such as racquets, balls, and bags.

17.     Running Warehouse is an online retail store specializing in running apparel and equipment, such as shoes, running clothing, and other clothing.

CLASS ACTION COMPLAINT

18.     Skate Warehouse is an online retail store featuring skateboarding equipment, such as skateboards and skate shoes.

19.     In the regular course of their business, Defendants collect and maintain the PII of customers and former customers.

20.     Defendants require customers to provide personal information before it provides them services and in connection with purchases made with Defendants. That information includes, *inter alia*, names, addresses, and payment card numbers, expiration dates, and card security codes.

21.     Plaintiff and Class members are, or were, customers of Defendants and entrusted Defendants with their PII.

22.     Each of the Defendants' websites contain a similar Privacy Policy that promises customers that each Defendant "respects your privacy and is committed to protecting it through our compliance with this Privacy Policy ("Policy")."[1]

23.     Defendants were aware of the importance of safeguarding their customers' sensitive payment card information from the foreseeable consequences that would occur if their data security systems were breached.

### *The Data Breach*

24.     On or about October 15, 2021, Defendants discovered that an unauthorized individual, or unauthorized individuals, gained access to Defendants' network systems. Defendants state in their letter to those affected by the breach that the breach occurred on October 1, 2021[2]. Defendants have not revealed how long cybercriminals may have had access to their computer systems.

25.     Defendants began to notify customers about the data breach on or about

---

[1] *See, e.g., Privacy Policy Overview*, RUNNING WAREHOUSE, https://www.runningwarehouse.com/privacypolicy.html (last visited Jan. 4, 2022); *Privacy Policy*, TACKLE WAREHOUSE, https://www.tacklewarehouse.com/privacypolicy.html (last visited Jan. 4, 2022).

[2] *See* https://attorneygeneral.delaware.gov/wp-content/uploads/sites/50/2021/12/Pages-from-Tackle-Warehouse-Regulatory-Notice-Packet-DE.pdf (last visited Jan. 4, 2022)

CLASS ACTION COMPLAINT

December 16, 2021.  The letters that Defendants sent to Plaintiff and the Class state that the information that was accessed included a person's name, address, payment card number, expiration date, and payment card security code." *Id*.

26.    The fallout of the Data Breach was immediate, as customers of Defendants took to the internet to complain about and describe many instances of fraud suffered as a result of the Data Breach. A sampling of these complaints from multiple forum threads is below (all *sic*):

**BassBoat Central**[3]



[3]   *Tackle warehouse breach update*, BASSBOAT CENTRAL, http://www.bbcboards.net/showthread.php?t=1158863 (last visited Jan. 4, 2022).

1

**woppercatcher**
OFFLINE
Member
Join Date: Dec 2010
Location: Hot Springs Village
Posts: 3,911

I got breached in less than a week on two different cards one of which wasn't used at TW. The last charge was at BassPro. It happens all the time to many companies or people just get your information other ways. It's a pita but all you can do is use a card with a little credit line for purchases when possible and set up fraud alerts. Even if the vendor lets you know of the possible breach it doesn't make it less of a pain.

12-27-2021, 10:30 PM   #7

2021 Skeeter ZX225
2021 Yamaha SHO 225

💬 Reply With Quote

**Nitro Z7**
OFFLINE
Member
Join Date: Apr 2010
Location: Poway
Posts: 169

Mine got hit around the beginning of Dec, .40 in Alabama then my CC Co called me before they approved 1K at Best Buy, cancelled card and got a new one.

12-28-2021, 09:29 AM   #8

**Marc Marcantonio**
OFFLINE
Member
Join Date: Sep 2004
Location: Steilacoom, WA
Posts: 4,878

12-28-2021, 01:19 PM   #12

> 🔖 Originally Posted by **woppercatcher** 🔗
> *I don't have a TW account, I had just used my debit card at TW as well as other vendors around that time. I got tipped off of something wrong when I saw a .15 transaction from crypto.com on my card so I cancelled the card before they could get any money.*

Yea, I got a text alert for a small transaction for crypto.com also; I didn't see it immediately because I was driving to take donuts to my niece's family on a Sunday morning. By the time I got to their house (15 minutes later) someone started buying crypto currency in chunks of a couple thousand at a pop. I frantically called the bank and got put on hold while I was watching the scumbags drain my account. Finally got transferred to the fraud department who stopped further transactions in the middle of continued purchases. It baffles me how these banks can't nail the thieves when they see them actively making transactions from my account. Finally got it all stopped, but I now have thousands of dollars on hold in my account while they process the fraud claims (multiple ones since the thieves made multiple consecutive purchases). If I didn't have my account setup for text notifications of purchases they would have been able to drain my account. Cancelled my cards and had to get new ones.

If you use a credit or debit card to make purchases, make sure you setup notifications for every purchase. When you see a small unexpected charge for less than a dollar, your account is likely being tested to verify the numbers work; then the thieves start going to work to drain your account.

**Bobby Gray**
OFFLINE
Member
Join Date: Sep 2015
Location: West Tennessee
Posts: 377

Citi caught mine and shot me an email. small charge followed by 2 larger ones. 2/3 were labeled as something to do with fishing? Still no letter here, but feel pretty comfortable it happened at TW. Not too big a deal.. Citi reversed all from my acct.. canceled my card and sent me a new one. Hey.. there is a bright side.. finally figured out how to get out of the BASS auto renew subscription never ending money drain.

12-28-2021, 05:13 PM   #16

CLASS ACTION COMPLAINT

**BassResource.com**





[4] *Tackle warehouse scam*, BASS RESOURCE, https://www.bassresource.com/bass-fishing-forums/topic/243544-tackle-warehouse-scam/page/6/ (last visited Jan. 4, 2022).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



27  [5] *Tackle warehouse scam*, BASS RESOURCE, https://www.bassresource.com/bass-fishing-
28  forums/topic/243544-tackle-warehouse-scam/page/7/ (last visited Jan. 4, 2022).





**Texas Fishing Forum**[7]

---

[6] *Tackle warehouse scam*, BASS RESOURCE, https://www.bassresource.com/bass-fishing-forums/topic/243544-tackle-warehouse-scam/page/9/ (last visited Jan. 4, 2022).

[7] *Personal Data Breach Tackle Warehouse*, TEXAS FISHING FORUM, https://texasfishingforum.com/forums/ubbthreads.php/topics/14231586/1 (last visited Jan. 4, 2022).



*Defendants Knew that Criminals Target PII*

27.    At all relevant times, Defendants knew or should have known their customers', Plaintiff's, and all other Class members' PII was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from cyber-attacks that Defendants should have anticipated and guarded against.

---

[8] *Personal Data Breach Tackle Warehouse*, TEXAS FISHING FORUM, https://texasfishingforum.com/forums/ubbthreads.php/topics/14231586/2 (last visited Jan. 4, 2022).

CLASS ACTION COMPLAINT

28.    PII is a valuable property right.[9] The value of PII as a commodity is measurable.[10] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[11] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[12] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

29.    As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

30.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable.

---

[9] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INTERNATIONAL FEDERATION FOR INFORMATION PROCESSING 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[10] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[11] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY 4 (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[12] *See U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB DATA CENTER OF EXCELLENCE (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

- 11 -

CLASS ACTION COMPLAINT

Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[13]

31.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

32.     It is particularly well known that sensitive payment card information is valuable and frequently targeted by hackers. One article has noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers," and that "[m]any of them [are] caused by flaws in payment systems either online or in stores."[14]

33.     Financial institutions and credit card processing companies have issued rules and standards governing the basic measures that merchants must take to ensure that consumers' valuable data is protected.

34.     The Payment Card Industry Data Security Standard ("PCI DSS") is a list of twelve information security requirements that were promulgated by the Payment Card Industry Security Standards Council. The PCI DSS list applies to all organizations and environments where cardholder data is stored, processed, or transmitted, and requires merchants like Defendants to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies.

35.     The twelve requirements of the current PCI DSS are: (1) Install and maintain a firewall configuration to protect cardholder data; (2) Do not use vendor-supplied

---

[13] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*: *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[14] Dennis Green, et al., *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

CLASS ACTION COMPLAINT

defaults for system passwords and other security parameters; (3) Protect stored cardholder data; (4) Encrypt transmission of cardholder data across open, public networks; (5) Protect all systems against malware and regularly update anti-virus software or programs; (6) Develop and maintain secure systems and applications; (7) Restrict access to cardholder data by business need to know; (8) Identify and authenticate access to system components; (9) Restrict physical access to cardholder data; (10) Track and monitor all access to network resources and cardholder data; (11) Regularly test security systems and processes; (12) Maintain a policy that addresses information security for all personnel.[15] Furthermore, PCI DSS sets forth detailed and comprehensive requirements that must be followed to meet each of the twelve standards.

36.    Defendants were at all times fully aware of their data protection obligations in light of their participation in the payment card processing networks and the stores' daily collection and transmission of millions of sets of payment card information.

37.    Because Defendants accepted payment cards containing sensitive financial information, they knew that their customers were entitled to, and did in fact rely on them to, keep that sensitive information secure from would-be data thieves in accordance with the PCI DSS requirements.

38.    Additionally, according to the Federal Trade Commission ("FTC"), the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 ("FTCA"), 15 U.S.C. § 45.

39.    In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no

---

[15] *Data Security Standard: Requirements and Security Assessment Procedures*, PAYMENT CARD INDUSTRY (PCI), https://www.pcisecuritystandards.org/documents/ PCI_DSS_v3-2-1.pdf?agreement=true&time=1641264387705 (last visited Jan. 4, 2022).

CLASS ACTION COMPLAINT

longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone may be trying to hack the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

40.　　The FTC has also issued orders against businesses that failed to employ reasonable measures to secure payment card data. These orders provide further guidance to businesses with regards to their data security obligations.

41.　　As noted above, Defendants should have been aware of the need to have adequate data security systems in place. Despite this, Defendants failed to maintain their data security systems in a meaningful way so as to prevent data breaches. Defendants' data security flaws run afoul of industry best practices and standards.

42.　　Had Defendants maintained their information technology systems, adequately protected them, and had adequate security safeguards in place, it could have prevented the Data Breach.

43.　　As a result of industry warnings, awareness of industry best practices, the PCI DSS, and numerous well-documented retail (and other) data breaches, Defendants were alerted to the risk associated with failing to ensure that their systems were adequately secured.

44.　　Indeed, Defendants were alerted to the risk of a payment card data breach by recent breaches of other large retailers such as, *inter alia*, Target, GameStop, Chipotle, Jason's Deli, Whole Foods, Sally Beauty, Neiman Marcus, Michaels Stores, and Supervalu.

45.　　Despite the fact that Defendants were on notice of the very real possibility of consumer data theft and that Defendants knew or should have known about the elementary infirmities associated with their security systems, they still failed to make

1  necessary changes to their security practices and protocols, and permitted a massive data
2  breach to occur.

3      46.    Defendants, at all times relevant to this action, had a duty to Plaintiff and
4  members of the class to: (a) properly secure their PII and card information submitted to
5  or collected by Defendants; (b) encrypt card information using industry standard
6  methods; (c) use available technology to defend their systems from well-known methods
7  of invasion; (d) act reasonably to prevent the foreseeable harms to Plaintiff and the class,
8  which would naturally result from payment card information theft; and (e) promptly
9  notify customers Defendants became aware of the potential that customers' PII may have
10  been compromised.

11     47.    Defendants permitted customers' payment card information to be
12  compromised by failing to take reasonable steps against an obvious threat.

13     48.    In addition, leading up to the Data Breach, and during the course of the
14  breach itself and the investigation that followed, Defendants failed to follow the
15  guidelines set forth by the FTC.

16     49.    Industry experts are clear that a data breach is indicative of data security
17  failures. Indeed, Julie Conroy—research director at the research and advisory firm Aite
18  Group—has identified that: "If your data was stolen through a data breach that means
19  you were somewhere out of compliance" with data security standards.[16]

20          ***Theft of PII Has Grave and Lasting Consequences for Victims***

21     50.    Theft of PII is serious. The FTC warns consumers that identity thieves use
22  PII to exhaust financial accounts, receive medical treatment, start new utility accounts,
23  and incur charges and credit in a person's name.[17]

24

25  ───────────────
    [16] Lisa Baertlein, *Chipotle Says Hackers Hit Most Restaurants in Data Breach*,
26  REUTERS (May 26, 2017), http://www.reuters.com/article/us-chipotle-cyber-
    idUSKBN18M2BY.
27  [17] *See What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER
28  INFORMATION,

───────────────
- 15 -
CLASS ACTION COMPLAINT

51.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[18] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, use the victim's information in the event of arrest or court action.[19]

52.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[20]

53.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

---

https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last visited Jan. 4, 2022).

[18] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. 12 C.F.R. § 1022.3(g).

[19] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[20] *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER 5 (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last visited Jan. 4, 2022).

CLASS ACTION COMPLAINT

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[21]

54.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used and it takes some individuals up to three years to learn that information.[22]

---

[21] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIVACY FORUM 7 (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf.

[22] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

CLASS ACTION COMPLAINT

55.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and the Other Class Members*

56.    As a result of the events detailed herein, Plaintiff and members of the class suffered actual palpable fraud, injury, and losses resulting from the Data Breach, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the purchases made with Defendants that Plaintiff and class members would not have made had they known of Defendants' careless approach to cybersecurity; lost control over the value of personal information; unreimbursed losses relating to fraudulent charges; losses and fees relating to exceeding credit and debit card limits, balances, and bounced transactions; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, including sensitive payment card information.

57.    These costs and expenses will continue to accrue as additional fraud alerts and fraudulent charges occur and are discovered.

58.    For example, the payment card information stolen from Defendants can be used to drain debit card-linked bank accounts, make "clone" credit cards, or to buy items on certain less-secure websites.

59.    Defendants' failure to adequately protect their customers' PII and payment card information has resulted in consumers having to undertake various errands (e.g., obtaining credit monitoring, checking credit reports, etc.) that require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of their own money—while Defendants are doing very little to assist those affected by the Data Breach, and withholding important details about the Data Breach as they conduct their

CLASS ACTION COMPLAINT

investigation. Instead, Defendants are putting the burden on the consumer to discover possible fraudulent transactions.

## CLASS ALLEGATIONS

60.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

61.    Plaintiff brings this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All United States residents whose PII was accessed by and disclosed to unauthorized persons in the Data Breach, including all United States residents who were sent a notice of the Data Breach.

62.    Excluded from the Class are the Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

63.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

64.    **Numerosity:**  The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Defendants reported to the Maine Attorney General that approximately 1,813,224 individuals' information was exposed in the Data Breach.

65.    **Commonality and Predominance:** Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

> a.  Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

b.  Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

c.  Whether an implied contract existed between Class members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII from unauthorized access and disclosure;

d.  Whether Defendants breached their duties to protect Plaintiff's and Class members' PII; and

e.  Whether Plaintiff and all other members of the Class are entitled to damages and the measure of such damages and relief.

66.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

67.  **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

68.  **Adequacy:** Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

69.  **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial

detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

### NEGLIGENCE

70.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71.    Defendants owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting their PII in their possession, custody, or control.

72.    Defendants knew the risks of collecting and storing Plaintiff's and all other Class members' PII and the importance of maintaining secure systems. Defendants knew of the many data breaches that targeted retailers in recent years.

73.    Given the nature of Defendants' business, the sensitivity and value of the PII they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

74.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware

systems to safeguard and protect PII entrusted to them—including Plaintiff's and Class members' PII.

75.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

76.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

77.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## <u>COUNT II</u>

### NEGLIGENCE PER SE

78.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79.    Defendants' duties arise from Section 5 of the FTCA, 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII.

80.    Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII, including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

81.    Defendants' violation of Section 5 of the FTCA constitutes negligence per se.

82.    Plaintiff and Class members are within the class of persons that Section 5 of the FTCA was intended to protect.

83.    The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA was intended to guard against.

84.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

85.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violation of Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT III

## BREACH OF IMPLIED CONTRACT

86.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87.    In connection with making purchases from Defendants' website, Plaintiff and all other Class members entered into implied contracts with Defendants.

88.    Pursuant to these implied contracts, Plaintiff and Class members paid money to Defendants and provided Defendants with their PII. In exchange, Defendants agreed to, among other things, and Plaintiff understood that Defendants would: (1) provide goods to Plaintiff and Class member; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII; and (3) protect Plaintiff's and Class members' PII in compliance with federal and state laws and regulations and industry standards.

89.    The protection of PII was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Defendants, on the other hand. Indeed, Defendants were clear in their Privacy Policies, and Plaintiff understood, that Defendants supposedly respect and are committed to protecting customer privacy.

90.    Had Plaintiff and Class members known that Defendants would not adequately protect their customers' and former customers' PII, they would not have purchased goods from Defendants.

91.    Plaintiff and Class members performed their obligations under the implied contract when they provided Defendants with their PII and paid for goods from Defendants.

92.    Defendants breached their obligations under their implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain

security protocols and procedures to protect Plaintiff's and Class members' PII in a manner that complies with applicable laws, regulations, and industry standards.

93.    Defendants' breach of their obligations of their implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

94.    Plaintiff and all other Class members were damaged by Defendants' breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT

95.    Plaintiff realleges and incorporates by reference paragraphs 1–69 as if fully set forth herein.

96.    This claim is pleaded in the alternative to the breach of implied contract claim.

97.    Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid for healthcare services or other services.

98.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class Members. Defendants also benefitted from the receipt of Plaintiff's and Class members' PII, as this was used to facilitate payment.

99.    As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments

CLASS ACTION COMPLAINT

made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

100.    Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

101.    Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## COUNT V

### VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY
### Cal. Civ. Code §§ 1798.100, *et seq*. ("CCPA")

102.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

103.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

104.    Plaintiff is a "consumer" as defined by Civ. Code § 1798.140(g) because he is a "natural person who is a California resident, as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

105.   Defendants are "business[es]" as defined by Civ. Code § 1798.140(c) because each:

    a.   is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners;"

    b.   "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information;"

    c.   does business in and is headquartered in California; and

    d.   has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

106.   Plaintiff's PII was subject to unauthorized access and exfiltration, theft or disclosure because of Defendants' inadequate security measures.

107.   Plaintiff's PII was in nonencrypted and nonredacted form, allowing criminals full access to it.

108.   The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information. Defendants failed to implement reasonable security procedures to prevent unauthorized access of Plaintiff's and Class members' PII as a result of a cyber-attack.

109.   Plaintiff sent a written notice to Defendants pursuant to Civil Code § 1798.150(b)(1), identifying the specific provisions of the CCPA Plaintiff alleges

Defendants have or are violating. Although a cure is not possible under the circumstances, if as expected Defendants are unable to cure or do not cure the violation within 30 days, Plaintiff will amend this complaint to pursue actual or statutory damages as permitted by Civil Code § 1798.150(a)(1)(A).

110.   As a result of Defendants' failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks actual damages, injunctive and declaratory relief, and any other relief as deemed appropriate by the Court.

<u>COUNT VI</u>

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL")**

111.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112.   The California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*, prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

113.   In the course of conducting their business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, the CCPA, Section 5 of the FTCA and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiff and Class members reserve the

right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

114.  Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), and Section 5 of the FTCA. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

115.  The UCL also prohibits any "fraudulent business act or practice." Defendants' nondisclosures and misrepresentations regarding the vulnerability of their network systems and their inadequate data security were false, misleading and likely to deceive the consuming public in violation of the UCL.

116.  The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violations of the UCL. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their

PII, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

117. Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct, and more data breaches will occur. Plaintiff, therefore, on behalf of himself, Class members, and the general public, also seeks restitution and an injunction prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## <u>JURY TRIAL DEMAND</u>

Plaintiff, individually and on behalf of all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

Dated:  January 4, 2022                    Respectfully submitted,

_/s/ Tina Wolfson_
TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
ROBERT AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310.474.9111
Facsimile:   310.474.8585

BEN BARNOW*
b.barnow@barnowlaw.com
ANTHONY L. PARKHILL*
aparkhill@barnowlaw.com
RILEY W. PRINCE*
rprince@barnowlaw.com
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Telephone:  (312) 621-2000

*pro hac vice to be filed

Attorneys for Plaintiff and the Proposed Class